**O. Hogan HARRISON, et al.**

v.

**AVALON PROPERTIES, LLC, et al.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

May 14, 2007 Session.

Aug. 27, 2007.

Permission to Appeal Denied by Supreme Court Jan. 28, 2008.

W. Gerald Tidwell, Jr., Chattanooga, Tennessee for the Appellants, Avalon Golf Properties, LLC, a Tennessee limited liability company, a.k.a. Landmark Golf Properties, LLC, a Tennessee limited liability company, a.k.a. Landmark Development, Inc.

Gregory H. Harrison, Knoxville, Tennessee for the Appellees, O. Hogan Harrison, and Sally D. Harrison.

## OPINION

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

O. Hogan Harrison and Sally D. Harrison ("Plaintiffs") sued Avalon Properties, LLC ("Avalon Properties"), Avalon Golf Properties, LLC ("Avalon Golf"), and Usonia Homes, Inc. ("Usonia") for breach of contract and negligent misrepresentation, among other things, in connection with the construction of Plaintiffs' house. Plaintiffs were granted a default judgment against Usonia for its failure to answer the complaint. After a bench trial, the Trial Court entered an order of involuntary dismissal pursuant to Tenn. R. Civ. P. 41.02 as to Avalon Properties. The Trial Court also entered a Final Judgment incorporating by reference the Trial Court's Opinion finding and holding, *inter alia*, that Avalon Golf made representations to Plaintiffs through its agent that Usonia was qualified to build the house and implicitly vouched that Usonia had the ability to fund the work; that the representations were made with the intent to induce Plaintiffs to rely on them; that Plaintiffs did rely on the representations to their detriment and were damaged; and that Avalon Golf was negligent in the selection of Usonia as the exclusive builder. The Trial Court awarded Plaintiffs a judgment of $164,065.87. Avalon Golf appeals to this Court. We reverse that portion of the Trial Court's judgment holding Avalon Golf liable for negligent misrepresentation and negligent selection, and affirm as to the other defendants.

### Background

In the late 1990's, Plaintiffs, who were preparing to retire, began looking to purchase property in the Avalon community located in Loudon County, Tennessee where they enjoyed playing golf. They spoke with Sherron Burleson, a real estate agent who had an office in the clubhouse at Avalon, regarding their purchasing property. Ms. Burleson told Plaintiffs about a new planned development within the Avalon community, which came to be known as The Legends. In March of 2001, Plaintiffs signed a reservation agreement ("Reservation Agreement") giving them the right to select a lot from the 48 lots within The Legends community. Plaintiffs made a $5,000 deposit on the lot. This deposit was refundable if Plaintiffs later decided not to purchase a lot within The Legends. The Reservation Agreement granted the seller, Avalon Properties, the right to select the builder to be used. Avalon Golf later purchased portions of the Avalon Community, including The Legends, from Avalon Properties. Avalon Golf then entered into an oral agreement with Sherron Burleson for Ms. Burleson to sell lots for Avalon Golf.

Avalon Golf entered into a contract with Usonia in November of 2001, which, as pertinent to this appeal, granted Usonia the right to be the exclusive builder within The Legends. Plaintiffs chose a lot within The Legends and, in order to take advantage of a construction/perm loan program with First Tennessee Bank, executed a contract with Usonia to build their home and then purchased the lot directly from Avalon Golf.

Construction began on Plaintiffs' home but progress was slow. In March of 2003, Plaintiffs received a letter from First Tennessee Bank informing them that Usonia was not paying its subcontractors. After discussions with George Ricker of Usonia, Plaintiffs chose to allow Usonia to continue as their builder. Ultimately, however, Plaintiffs were dissatisfied with the work done by Usonia and this lawsuit resulted. Usonia failed to answer Plaintiffs' complaint and, at the beginning of the trial, the Trial Court granted Plaintiffs a default judgment against Usonia. Trial proceeded against Avalon Properties and Avalon Golf.

Given Plaintiffs' claims and the issues raised on appeal, a detailed recitation of the evidence presented at trial is necessary. Plaintiff Sally Harrison testified at trial. Ms. Harrison testified about what happened after she and her husband signed the Reservation Agreement. Plaintiffs originally were sixth in line to choose a lot but "[t]he other five people dropped out because the progress was so slow." Ms. Harrison testified that she spoke to Sherron Burleson frequently, and Ms. Burleson told Ms. Harrison that Markley Builders had been chosen as the builder for The Legends. Ms. Harrison stated: "I was pleased with the fact that it was Markley Builders because I was aware of Markley Builders, and I knew they had built some really nice upscale homes ... and had a real good reputation in the Knoxville area." Plaintiffs chose a plan from among several sent to them by Ms. Burleson. Ms. Harrison testified:

> I called [Ms. Burleson] and told her that we had chosen a plan and did I need to bring it by the office, she said, No, just disregard those. Just throw those away. We are going with another builder. And I said, Oh, really? And she said yes. And I said, Well, you know, Markley Builders is—you know, their reputation is really good. And she said,

Well, we found a much better builder. He's coming out of Texas, and he's going to have better house plans for those lots in The Legends.

Plaintiffs signed a contract with Usonia to construct their house. Ms. Harrison testified regarding the execution of the agreement with Usonia stating:

> Mr. Ricker [of Usonia] told us that we had to—that we had to sign the construction contract with him before we purchased the lot. I'm trying to remember if Sherron Burleson told us the same thing. Honestly, I can't remember if Sherron Burleson told us that this would be the sequence of things, that we would have to sign a construction contract with Usonia Homes and then purchase the lot. I know we were told that by Mr. Ricker, but I can't remember for sure if Sherron Burleson—but she was right there every step of the way.

Plaintiffs originally wanted lot one in The Legends and were told they could not have that lot because the builder wanted to use that lot for a model home. Ms. Harrison testified that Plaintiffs had a meeting with:

> George Ricker, Danny Spitzer, Sherron Burleson. I can't—I know Sherron Burleson was there when Mr. Ricker approached us with the idea that we could have lot one if we would let him use it as a model home. In other words, I can't honestly remember if Sherron Burleson was, in fact, there the night in the trailer of Usonia Homes that we signed the construction contract. I know she was there when Mr. Ricker, you know, said, hey, I've got a deal that will be good for all of us, you know. You can have lot one. You can purchase lot one if you will let me use your villa as a model for six months.

Plaintiffs paid $40,000 upon executing the contract with Usonia. Plaintiffs then obtained financing for the construction through "First Tennessee Bank, which was—we were led into by Usonia Homes. I mean, we didn't approach First Tennessee by ourselves. They had something going with Usonia." The contract construction amount of the house that Usonia was to build for Plaintiffs was $260,000. Plaintiffs obtained a construction loan of $220,000 to cover the difference between their initial $40,000 payment to Usonia and the contract construction amount of $260,000.

Ms. Harrison testified that the home "was supposed to be finished in 120 working days. Of course, they considered working days Monday through Friday and excludes national holidays and days lost to inclement weather." If construction exceeded the 120 day limit, Usonia was to pay the construction loan interest. Construction began approximately in mid-May. The home was not completed within the 120 days. Ms. Harrison testified that Usonia acknowledged that it was obligated to start paying the construction loan interest and that Usonia paid some of the construction loan interest, but not all that they were supposed to pay.

Ms. Harrison testified that if Plaintiffs converted their construction loan into a permanent loan within a certain time period, they were locked into a specific interest rate. However, if Plaintiffs failed to close the loan within that time period, they would lose the interest rate and would have to re-apply and re-qualify for a permanent loan. First Tennessee Bank agreed to delay the conversion date until July 25, 2003. Ms. Harrison testified construction was very slow and stated:

they started in May. And it was just so slow. I mean, they hadn't even—I mean, I can't even remember in January

of 2003 if they even had, you know, framed—the framers had been there to frame it in. I know that it had not been Sheetrocked in January of 2003.

After Plaintiffs received the letter from First Tennessee Bank in March of 2003, informing them that Usonia was not paying subcontractors, Ms. Harrison called her son, First Tennessee Bank, and then Scott Krahl of Avalon Golf. Ms. Harrison testified regarding her conversation with Mr. Krahl stating: "His words exactly was, 'I have been dreading this call.'" She further testified:

I told [Scott Krahl] I—we needed his help because he was supposed to be the project manager of this whole thing, the whole community, including The Legends, the project manager, to make sure things are done properly. And we didn't have a clue—and if I could back up to what went on in the meeting at the bank and give you some idea why I went to him for help—.... Well, the result was that there wasn't really anything that we could do, that we couldn't act as our own subcontractor because that was my question. Okay. What if we just tell Usonia to get off the property and let us finish, you know, our house ourselves. ... And after the meeting, the feeling I had was of complete hopelessness. I didn't know what to do. At this point I called Scott Krahl and said—thinking that some way he might have an answer for us because we were in such a predicament and thinking that they would want the integrity of the community. They wouldn't want a villa sitting there half finished or not even half finished. In March it wasn't even half finished.

Ms. Harrison testified that Mr. Krahl told her he would get back to her. Plaintiffs later met with Mr. Krahl, and at that time were told that Avalon Properties had severed their relationship with Usonia and

had another builder, Ed Zarb, who was to build out The Legends.

Plaintiffs met with Mr. Zarb. Ms. Harrison testified:

[Mr. Zarb] more or less didn't want to touch it with a ten-foot pole, but since he had been—got The Legends project, and he was supposed to build out The Legends. And at that time he was building a villa right next to our villa, and he said it would be advantageous to him to finish it for us because, you know, it would look bad for the whole property if that building . . . .

Plaintiffs also spoke with another builder about the situation. Ms. Harrison testified:

We determined that after talking to both builders that it was going to be way over a hundred more thousand dollars for them to come in and finish our villa, that we felt like no other builder wanted the liability of it because they didn't build the house from the ground up. And if they stepped in and finished, then they would be liable for it.

At that time, Plaintiffs had utilized most of their construction loan monies and had only "maybe 20,000" left. They eventually decided to allow Usonia to complete their house. Ms. Harrison stated:

I was really angry with Mr. Ricker and upset with him, but he convinced my husband and I that we would be foolish to let anybody else come in and finish it. The bank was out to get him. Everybody was out to get him, and all builders do this. He said they sell one house and get that money and pay subs on another house, and it's just like, you know, a vicious circle. They all do it. . . . See, he kept telling us that, yes, he had money problems, but his son was going to have this multi-million dollar deal in Arizona, that he was going to have plenty of money and everything was going to be okay.

Ms. Harrison testified that from a financial standpoint, Plaintiffs could not afford to switch to another builder. If they did, they would have had to go through the process of getting a mortgage loan again and Ms. Harrison explained:

in the meantime we had been charging things for the house, and this is stuff like faucets and light fixtures and necessities, not just, you know, things that you just get because you want. We had to use our credit cards to buy these things to finish the house. This is why Mr. Ricker was still working on the house. And I was going to Wholesale Supply, to Stokes Electric and Home Depot, every place, even buying boards for the ceiling. I mean, I was doing all of this because he had no money, and I was having—by that time the word was out. Nobody would give him credit. He had no money to buy anything. . . . And the reason I brought that up, because during that time we charged all of these things. So it changed our whole income thing. Like if we applied for a loan again, we had a lot more debts and liabilities than we did when we originally applied for the construction loan.

Plaintiffs closed their construction/perm loan on July 25, 2003, although the house was not completed. They were told that the house would be completed by that weekend. When they closed on the loan, Plaintiffs increased it from $220,000 to $280,000 in order to pay the subcontractors for "we knew we had to—we paid for heating and air conditioning twice, things that we had to have, like a heating and air conditioning . . . None of that extra money that we had borrowed went in our pocket. It all went to subs that we paid." Ms. Harrison testified that she and her husband had more than $317,000 in the house

when they closed, and then they spent at least $114,290 more.

Ms. Harrison was asked about upgrades to the house above and beyond what was contained in the original contract between Plaintiffs and Usonia. For example, the basement of the house was supposed to be unfinished but now has "a den area, a full bath and a bedroom and a little kitchenette." Ms. Harrison testified:

> our agreement with Usonia. They were going to have a model home and it not cost them a thing because we were getting the construction loan. We had purchased the lot. They weren't going to have any money in it, and they were going to be able to show that home for at least six months.

Ms. Harrison testified that the upgrades were to be done per their agreement with Usonia for the same original $260,000 price.

Ms. Harrison testified that while they waited for their house to be completed, Plaintiffs had to pay condo rent of $1,100 per month for a total of $8,800, and storage fees of $998. In addition to the rent on the condo and the storage fees, Plaintiffs also had to pay construction loan interest while waiting for their house to be finished. Ms. Harrison further testified that Plaintiffs have had problems with the house including a lot of water coming into the home and also "had raw sewage back up twice into our house and on the floor."

Ms. Harrison admitted that the first time she ever met Scott Krahl of Avalon Golf was at the closing on the lot, which was after Plaintiffs had signed the construction contract with Usonia.

Scott Krahl testified that he is the project manager at Avalon Golf Community, which includes The Legends. Mr. Krahl testified that Avalon Golf used four factors in selecting a builder, 1. Interviewed the builder; 2. Reviewed marketing proposals; 3. Confirmed builder's license; 4. Confirmed builder's financing. Mr. Krahl testified that Avalon Golf entered into the purchase agreement with Usonia in November of 2001, but did not confirm Usonia's licensing until August 2003. Mr. Krahl stated:

> when we interviewed the other two builders, we didn't ask to see their license, you know. We are assuming that when you go to build a home you have to pull a permit. Before you pull a permit, you have to show a license. ... So we didn't confirm it. We assumed that they had the license, all three builders we talked to.

Mr. Krahl testified he was aware that Usonia had a $250,000 business line of credit and a commitment from First Tennessee Bank for two construction loans for homes that were in the Avalon community, but not within The Legends. However, the $250,000 line of credit was for Usonia Holdings, LLC, which has an address in Putnam Valley, New York. The entity that Avalon Golf contracted with, Usonia Homes, Inc., had an address of Sherway Circle, Knoxville.

Mr. Krahl testified he was told sometime around the end of 2002 or early in 2003 that Usonia previously had financial problems in Texas and possibly in Oklahoma. Although Plaintiffs did not close on their home until July of 2003, Mr. Krahl did not share this information regarding Usonia's alleged financial problems with Plaintiffs. Mr. Krahl testified that Avalon Golf terminated Usonia July 10, 2002:

> Because in the contract we require them to build speculative homes in The Legends, to have a home that was available for purchase in The Legends. ... Well, their contract stated that they were to start a speculative home sometime in

May. I guess it was May 19th. Sometime in May. And they didn't do that.

In fact, from November of 2001, when the contract between Avalon Golf and Usonia was executed, until July of 2002, when Avalon Golf terminated Usonia, Usonia never purchased a lot in The Legends.

John Walters, Avalon Golf's chief financial officer and general counsel, testified regarding Avalon Golf's selection of Usonia as the builder. Mr. Walters testified:

> We spent a number of discussions talking about the contract itself, negotiating the contract provisions, about how many lots they had to take down, when they had to take them down, what period of time. We talked a lot about their financing and meeting that take-down provision to their cash flow requirements and how they would meet that take-down provision. Had a conference—we had a meeting with First Tennessee in First Tennessee's offices down in downtown Knoxville with Linda Cox. Jeffrey was on a conference call there. There was another representative from the bank, another gentleman, and I'm not—I don't remember his name—myself, Scott, George Ricker, Danny Spitzer talking about the financing that the bank was going to provide them in connection with custom and spec homes and those type of things.

\* \* \*

Jeffrey Ricker indicated to me that he had just sold some type of dot-com business and had substantial assets himself that he was backing this venture with. So I'm assuming that that 250,000, based on the terms of this line of credit, may have been that since it looks like he probably put up cash or—but I'm assuming that Usonia Holdings—and I don't remember specifically talking to him about Usonia holdings, but I believe that Usonia Holdings may have been a parent company of Usonia Homes.

\* \* \*

> [M]y impression walking out of our meeting with the bank was that they were very excited to have these people as customers, that they were—they indicated at least to us, you know, they thought Avalon was an up and coming—they did say that prior to our taking over that it had suffered somewhat in slow sales. But they liked the plan. They liked the company. They were—I got the impression they were very willing to back these folks in their endeavor.

Mr. Walters admitted he never confirmed any assets from the alleged sale of a dot-com business as he assumed the bank would do this.

When asked why Avalon Golf chose Usonia rather than Markley or Zarb, Mr. Walters stated:

> we wanted someone who would focus on Avalon. Both Markley and Zarb had other commitments in other subdivisions, and, you know, we wanted someone who was going to devote their entire attention to Avalon. You know, we had numerous discussions with them. I was very impressed with their business plan. They went above and beyond both Zarb and Markley in providing background research on what they thought the market was, what they—you know, they used some marketing studies. They put a lot of time and effort into this.

> Jeffrey Ricker was very professional, very bright. My impression was he understood financing and cash flows. We talked a lot about with him—that's my background. I talked a lot about how they were going to finance it, how they were going to make the draws. We talked about their cash flow and how they would be financing the custom

homes and had a good plan to make this work.

We had a hard time getting plans out of Zarb and Markley timely. They were very timely in their response. And, you know, in the process of my work I've interviewed and talked to a lot of professionals, lawyers for jobs, lawyers, accountants, real estate agents, insurance agents, and, you know, talking to George Ricker, he was obviously very qualified. He had more building background than both Zarb and Markley put together, a wider range of experience than they had, many more licenses. They were just residential construction licenses. He was a master plumber, master electrician, commercial, municipal. He was very, very—appeared to be very, very qualified to oversee the construction.

Mr. Walters further stated: "I thought it was obvious at the time [that George Ricker] had [a contractor's license], and it was certainly obvious within 30 days of the contract that he had it because they pulled the building permit and started construction." Mr. Walters admitted that he never saw any of Usonia's licenses or certifications prior to choosing Usonia as the builder.

Mr. Walters testified:

the contemplation was they would begin, you know, six to eight, maybe as many as ten custom homes in that Legends area. That would be generating for them income as they progressed during that construction. And that they would then use that to start their spec homes and move on.

* * *

I think I called Scott at the early part of June and said what's going on with Usonia, find out when they are going to take their first spec lot down. I think he called George, and George indicated to

him that, you know, the home that they sold up front—or one of the homes that they were building up front, one had been sold and one that they were still sitting on, and they weren't willing to make the financial commitment at that point to build more lots—or build more homes. And, you know, we talked to them through the month of June, and they said we are not going to do it. So we terminated them for not following the terms of the agreement.

* * *

[T]hey had several homes under construction at that point, and I had—we had no indication that they were in any financial problems. They indicated to us that they didn't want—that for financing reasons they didn't want to proceed. You know, it's not any different than actually Ed Zarb did. Ed Zarb was the second—when they were terminated for not doing—or following the terms of this agreement, we negotiated a subsequent agreement with Ed Zarb. He was required to take a certain number of lots down with a certain—you know, within a certain period. He did take some lots down. His third lot he didn't take down because he didn't want to commit the financing, and we terminated that contract. I don't think Ed Zarb at that point had any financial problems. He just wasn't willing to make the financial commitment that he had made to us. So we terminated him . . . .

Mr. Walters calculated that Plaintiffs had spent $416,933.86 on their house. This figure does not include any costs that may be needed for repairs. Mr. Walters testified: "I know the house next door to [the Plaintiffs] sold for 400—485, 475. . . . Close to 500,000."

George Ricker of Usonia testified that Usonia Homes no longer exists. Mr. Rick-

er testified regarding his background stating: "I started in the construction trade as a plumber in the early 70's, plumbing and heating and air conditioning, and then in the early 80's in Texas started building. And I also hold a master electrician's license." Mr. Ricker met Mr. Burleson, the former owner of the Avalon community, in the 70's and the two did some business at that time. In the late 70's, Mr. Ricker left Knoxville and moved to Texas. Years later, after he moved back to Knoxville and established Usonia Homes, Mr. Ricker got in contact with Mr. Burleson who told him about the Avalon community. Eventually, Mr. Ricker had a meeting with people from the company that became Avalon Golf. He testified:

> [Avalon Golf] wanted a builder that would take down quite a few lots. We had—whether it was a written agreement at that time or what, we had approval from First Tennessee Bank for two spec construction loans, and that, of course, would be only two lots that we could take down. And I suggested to them that they subordinate the lots to Usonia homes, and they had no idea what I was talking about. ... Well, the owner of a lot can subordinate a lot to the—to a bank or another company which makes them—and I assume that the laws are the same—a second lien holder. And then they collect their moneys on their lot on a—either when the construction is started or when the house is sold, then they are paid for that lot. So they give away some of their rights of ownership.

Initially, Usonia was told they could not have The Legends, but Sherron Burleson later told Usonia the opportunity had opened up. Mr. Ricker testified:

> So we aggressively went after it. Most of those dealings and meetings were done with my son. I think some bro-

chures were made up early to show what we would do. A business plan was submitted. We just—I think we went after it harder than the other two, which I believe was Markley and Zarb.

Mr. Ricker testified about the deal with Avalon Golf stating:

> I decided that it was probably feasible because we were told there was 15 or 17 reservations and that probably all of those could be closed. So the way we had it done was a very slow take-down of lots to ensure that we could—that would make us using all of our construction money from First Tennessee Bank on the front two lots, lots ten and 11 in the front of the subdivision. But if we could build—close those 15 or 17—it ended up 12 they had, I think. But if we could close those, then we could take down enough lots in the back with contracts to more than make it feasible. And then as we sold the house up front, take another one down. It seemed—it seemed quite doable to me.

> \* \* \*

> We had worked with a company—and I believe it was call (sic) Remington Investment. They were an investment capital company that we started talking to before we even opened the corporation and couldn't go into real talks with them until the corporation was started. So in April we were already talking to investment capitalists. I only had one meeting with them at our offices in Knoxville. We were trying to borrow 3.2 million, and they were—and the only meeting I was with them they indicated to me that they were going to do it. They looked at Avalon. ... But it never developed.

Mr. Ricker testified about the construction/perm loan program with First Tennessee Bank stating:

I don't know if it was a new program or not, but First Tennessee Bank, Mrs. Cox, told us of a program that they had called construction perm, I think was the name of it, where the—if the owners had their lots, the bank loaned them their construction money, and then when the house was built, rolled it into a permanent loan. Well, that allowed us to do what we needed to do in order to build because, as I said, we only had the agreement for—with the bank for two loans, and I was expecting money to come in but at the time didn't have it. And it helped everyone to—with this program it allowed us to—the lots to be taken down in a timely manner.

He further testified about the construction/perm loan program stating, "if the agreements had been all valid and what we believed were 99 percent sure sales, it would have worked fine. And had we— and had Usonia owned any security, moneys that we were looking for, it would have been a very good program." Mr. Ricker testified: "My thoughts were that if we even—if we could just break even on the first five or six houses, that we could use those and make our money on the next 45. As it turned out, I was wrong."

Specifically regarding Plaintiffs' house, Mr. Ricker testified:

There was a lot of changes made to the original plans because we—and I say we. I wanted to show that home and wanted it to be all of the upgrades that we were going to offer. I must say my son never agreed with that. So it was upgraded. ... There were some things that [Plaintiffs] said they would like to have, and my comment to them was as long as we stay in the budget. Of course, we did not. ... Well, I think [the reason we did not stay within budget] was collective, but I would imagine that the one responsible for it was the one representing the builders, and that was me.

Mr. Ricker testified that at the time Usonia and Avalon Golf entered into their contract, Usonia was a licensed general contractor and that either he or Usonia held licenses including master plumber, heating and air conditioning installation, mechanical contractor, and electrician. Mr. Ricker stated:

I was the qualifying agent for the corporation and not an officer. The qualifying agent has to have the experience, time, be able to pass the examinations. We held commercial, industrial and residential buildings, which is referred to as a—I can't remember the exact termination but contractor's license. We had municipal utility license, which allowed us to do—we could have installed all of the utilities in the subdivision or outside the subdivision.

Mr. Ricker testified that his son, Jeffrey Ricker was the CEO of Usonia Homes and put all of the investment capital of $250,000 into Usonia. Mr. Ricker's understanding was that his son

was using Usonia Holdings, LLC—my recollection is he was using Usonia, LLC as part of his financial statement to get the guaranteed loan from First Tennessee, which they never actually issued that line of credit. That line of credit was never issued, to my knowledge, to Usonia Homes, Inc.

Mr. Ricker testified there was no misuse of funds for Plaintiffs' house. He testified that he spent $40,000 of his own personal money on the homes that Usonia had under construction at that time due to overages, where he "[p]ut more into the house than I should have." Mr. Ricker admitted that from November of 2001, to March of 2002, Usonia lacked capital sufficient to purchase even one lot.

Several experts testified regarding the damages sustained by Plaintiffs due to improper or substandard construction. Duris Vincent from D. Vincent Roofing Company, Inc. testified regarding his inspection of Plaintiffs' roof. Mr. Vincent prepared a proposal of the estimated cost of repair for the roof of $12,250.

Gary Cobble, senior project manager and estimator with Joseph Construction Company, inspected Plaintiffs' home in February of 2005 and prepared a report. Mr. Cobble testified that in the preparation of his report, he utilized copies of proposals from D. Vincent Roofing, Ferguson's Painting, LCJ Construction regarding masonry cost, and B–Dry Waterproofing, in addition to the Clayton home inspection report. Mr. Cobble testified that in the master bedroom: "There is about an eighth of an inch gap between the window trim and the window." He found a building code violation and potential problem for termites and wood rot in the interior of the front porch because neither a concrete cap nor a ceiling were used on the front porch. Mr. Cobble also found two other points of water intrusion into the house, one in the corner of the basement and one on the opposite wall. Mr. Cobble testified regarding the finding from the Clayton home inspection report of a 30% humidity reading in the downstairs bedroom and stated: "Once you get above 15 to 18 percent humidity readings, you can expect mold germination, wood rot, termites, all of the bad stuff associated with water getting into your home." Mr. Cobble also testified:

There are three areas where the landscaping on the exterior are actually backfilled against the house above the finished floor level inside. That is not good. I've seen that before; again, too many times more than I would like to. And that constant soaking of the wall by the landscaping, irrigation system, the mulch, the plants, it soaks through the walls. Then bad things start happening. The wood can start rotting. Carpet can start rotting. Drywall can start rotting. And mold can start germinating. So the front of the house, what I call the left side of the house, and the back side of the house where the landscaping is up above the floor level needs to go down.

Mr. Cobble further testified that the house does not have enough support posts and eventually "will sag, droop, sway, yes. It will start going down. That is not good." Mr. Cobble stated that if there were a defect or substandard work with regard to the foundation, it would be hard to tell without doing a destructive examination and "actually tearing brick away, digging soils away, tearing drywall away." Mr. Cobble also noted that there were some cosmetic issues including color variation due to at least two different colors of mortar being used and blemishes on the granite counter-top in the kitchen caused during installation. Mr. Cobble estimated a total cost for the repairs would be approximately $50,000. He did not incorporate the roofing quote from D. Vincent Roofing into his report because it duplicated some of the issues he noted in his report and it gave a price to replace shingles and he was not made aware of any problems with the shingles.

Jack Clayton Feldman, a home inspector with Clayton Inspection Service, Inc., testified regarding his inspection of Plaintiffs' house. He inspected the house in November of 2003 and prepared a report. Mr. Feldman testified that he found problems with the I-joists including improper nailing, improper use of the joist hanger, and cutting of the flanges, and that as a result of these problems the floor could settle or sag. Mr. Feldman further testified that either the brick or the surface below has moved and stated:

the brick could move for a variety of reasons. One, it could not be supported on—it may not be supported on a brick ledge or an actual footing for the brick. I don't know if that's the case. It could also move because there were an insufficient amount of brick ties, which are a metal tab that's fastened to the house and is inserted between the mortar joints of the brick and kind of bonds the brick to the house.

Mr. Feldman also noted problems with improperly installed flashing and saw no visible flashing at the chimney enclosure. Mr. Feldman testified that he noted water intrusion in the front porch area, in a foundation wall under the garage, and near the main water line. He tested for moisture inside the home and got a reading of 30% in one bedroom. Mr. Feldman explained: "wood coming from a lumber yard is supposed to be around 17 percent. Once you reach 20 percent, it's considered a moisture issue." Mr. Feldman testified: "I dug around the foundation a little bit to go below the grade to see if I could see if there is moisture proofing on the bricks. ... Well, in a couple of areas that I probed and dug I did not see any sign of moisture waterproofing." When asked if the home had been properly waterproofed if he would have found evidence of that, Mr. Feldman stated that he would have.

The parties entered into a written stipulation at trial. The stipulation provided that Harry Shelton, a licensed real estate appraiser for approximately ten years, performed an appraisal of Plaintiffs' house for Avalon Golf and concluded that sale value of Plaintiffs' house on the open market is $495,000, without regard to any of the claims made by Plaintiffs regarding deficient construction or the cost of any repairs of such problems.

After trial, the Trial Court entered its Final Judgment on February 27, 2006, in-

corporating by reference the Trial Court's Opinion finding and holding, *inter alia:*

The Court finds that when the Defendant, Avalon Golf, entered into its contract with Usonia, its agents knew or should have known that Usonia could not perform the contract because Usonia did not have sufficient capital to purchase or "take down" lots as required. Usonia had financing from a lending institution to build two homes which were not a part of "The Legends" development, but had no other source of funds with which to buy lots in "The Legends" or commence construction of homes on those lots. George Ricker, Usonia's builder, undoubtedly had the skills and experience to do the job, but Usonia's efforts to find other sources of investment capital failed. There was, in effect, no money available to Usonia to buy lots in "The Legends," and this was known by the agents of Avalon from the beginning. Not only was the contract between Avalon and Usonia doomed to fail, but Usonia's inability to perform the construction contract with the Plaintiffs was also evident to Avalon Golf from the beginning. Usonia kept the Plaintiffs' home going for much of the construction by using partial payments or draws received from the Plaintiffs and by apparently shuffling money from the other two houses for which it had financing. But Usonia's attempt to add special features to the Plaintiffs' home at extra cost (for Usonia to use as a demonstration home for other customers), and the inability to find other sources of funding spelled failure for Usonia, and resulted in damages to the Plaintiffs.

Avalon could mitigate its own losses somewhat by excusing Usonia from its obligation to be the exclusive purchaser of lots in the Legends. Avalon Golf proceeded to sell lots directly to third

persons. This allowed Avalon Golf to have some cash flow even though Usonia could not perform its contractual obligation to Avalon Golf to buy lots as scheduled.

But the purchasers of lots, and in this case the Plaintiffs, were not so fortunate, for they were required to use Usonia as the exclusive builder of homes in the Legends. Avalon Golf held Usonia out to the Plaintiffs as not only qualified to build their home from a technical point of view, but implicitly vouched for Usonia's ability to fund their work, even though Avalon Golf knew Usonia was undercapitalized. In this way Avalon misrepresented Usonia's ability to start and complete Plaintiffs' home.

Representations by the Defendant, Avalon Golf, through its agent, were made with the intent to induce Plaintiffs to rely on them. And Plaintiffs did rely upon such representations to their detriment. If Avalon Golf had not made such misrepresentation and failed to disclose to Plaintiffs that Usonia had no money, Plaintiffs would not be in this situation. But for the negligent misrepresentation of Defendant, Avalon Golf, these problems would not have occurred.

Furthermore, Defendant, Avalon Golf, was negligent in the selection process of the exclusive builder. The proof is clear that the Defendant utilized the following four criteria in selection:

1. Confirm licensing;
2. Confirm financing;
3. Conduct interview;
4. Review Marketing Proposal and Plans.

From the testimony at trial, the Defendant, Avalon Golf, did not confirm licensing until after selection. The Defendant did not adequately review marketing proposal and plans in that the plans presented did not necessarily fit the particular lots in the Legends.

\* \* \*

And finally, the only financing confirmed was one construction loan commitment letter from First Tennessee Bank to Usonia Homes, Inc. for two lots not included within "The Legends" Development a Two Hundred Fifty Thousand Dollar ($250,000.00) business line of credit to a separate and distinct entity under the name of Usonia Holdings, LLC, with an address in Putnam Valley, New York.

Not only was Avalon Golf negligent in its failure to follow its own criteria, the Defendant further failed to notify Plaintiffs of Usonia's financial inadequacies prior to their entering into a contract with Usonia in March 2002 and their purchase of Lot 1 in April 2002. It is the position of Plaintiffs which is supported by the proof, that Defendant was aware of such situation no later than January 2002. And finally, the Defendant failed to notify Plaintiffs of their termination of Usonia in July 2002. Such notification would have prevented the increased expenses which have been incurred by Plaintiffs.

The Trial Court awarded Plaintiffs a judgment against the defendants of $164,065.87. Avalon Golf appeals to this Court.

### Discussion

Although not stated exactly as such, Avalon Golf raises five issues on appeal: 1) whether the Trial Court erred in holding Avalon Golf liable for negligent misrepresentation; 2) whether the Trial Court erred in holding Avalon Golf liable for negligent selection of Usonia as the builder for The Legends; 3) whether the Trial Court erred in basing the measure of dam-

ages on the benefit of the bargain standard; 4) whether the Trial Court erred in holding that Plaintiffs were not comparatively at fault; and, 5) whether the Trial Court erred in failing to apportion comparative fault between Avalon Golf and Usonia.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R.App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001).

We first address whether the Trial Court erred in holding Avalon Golf liable for negligent misrepresentation. As our Supreme Court instructed in *Robinson v. Omer:*

> This Court has recognized three distinct actions in tort based upon misrepresentation: fraud or deceit; strict liability under Section 402B of the *Restatement (Second) of Torts* (1965); and negligent misrepresentation under Section 552 of the *Restatement (Second) of Torts* (1977). *Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 130 (Tenn.1995); *see also John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn.1991); *Jasper Aviation, Inc. v. McCollum Aviation, Inc.*, 497 S.W.2d 240, 242–43 (Tenn.1972).

> This case concerns the third cause of action, negligent misrepresentation. Tennessee has adopted Section 552 of the *Restatement (Second) of Torts* "as the guiding principle in negligent misrepresentation actions against other professionals and business persons." *Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592, 595 (Tenn.1991). Section 552 provides, in pertinent part, as follows:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, *supplies false information for the guidance of others in their business transactions*, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*Restatement (Second) of Torts* § 552 (1977) (emphasis added).

In discussing the requirements for recovery under Section 552, this Court has stated that liability in tort will result, despite the lack of contractual privity between the plaintiff and defendant, when,

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

> (2) the defendant supplies faulty information *meant to guide others in their business transactions;* and

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

(4) the plaintiff justifiably relies upon the information.

*John Martin Co.*, 819 S.W.2d at 431 (emphasis added); *accord Ritter*, 912 S.W.2d at 130.

*Robinson v. Omer*, 952 S.W.2d 423, 426–27 (Tenn.1997).

■ In order for liability to attach for a negligent misrepresentation, some statement or representation must have been made. The evidence presented at trial reveals that Plaintiffs had no contact whatsoever with anyone at Avalon Golf prior to executing their contract with Usonia. Given this, Avalon Golf made no representations to Plaintiffs which could have formed the basis for a cause of action for negligent misrepresentation. In addition, the only allegation of a representation made on Avalon's behalf by an agent, i.e., Sherron Burleson the real estate agent, was the statement that "we found a much better builder. He's coming out of Texas, and he's going to have better house plans for those lots in The Legends." This nebulous statement that Usonia would be "a much better builder" with "better house plans" is nothing more than a statement of opinion and is insufficient to form the basis for a cause of action for misrepresentation. It is far more akin to "the kind of loose general sales talk commonly referred to as 'puffing.'" *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 97 (Tenn.Ct.App.1996) (quoting Restatement (Second) of Torts § 402B cmt. g.) (analyzing a misrepresentation claim under Restatement (Second) of Torts § 402B in a case involving products liability). Additionally, there was no proof presented one way or the other that Usonia was or was not "a much better builder" with "better house plans" than the originally anticipated builder as there was

no proof presented as to the originally anticipated builder's abilities and house plans. Absent such proof, even given Plaintiffs' outcome with Usonia, it cannot be assumed that Ms. Burleson's statements were, in fact, a misrepresentation.

Neither Avalon Golf nor its agent made any representations to Plaintiffs that could serve as the basis for a claim of negligent misrepresentation. We, therefore, reverse the Trial Court's judgment holding Avalon Golf liable for negligent misrepresentation.

■ We next consider whether the Trial Court erred in holding Avalon Golf liable for negligent selection of Usonia as the exclusive builder for The Legends. To prove negligence, a plaintiff must show "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation." *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn.2000).

■ The record before us on appeal shows that Plaintiffs did not establish what the duty of care was that Avalon Golf allegedly owed to Plaintiffs with regard to the selection of Usonia as the builder. The Trial Court based its holding of negligent selection upon the fact that Avalon Golf was shown to have adopted certain criteria to use when it selected a builder and then failed to follow those criteria. However, the fact that Avalon Golf had these criteria does not, in and of itself, establish the applicable standard of care. As such, the fact that Avalon Golf may not have followed its own criteria when selecting a builder does not establish, by itself, a breach of any duty owed to Plaintiffs.

Perhaps even more importantly, the Trial Court specifically found that "George Ricker, Usonia's builder, undoubtedly had

the skills and experience to do the job, ...." The evidence does not preponderate against this finding. Rather, the evidence in the record on appeal shows that George Ricker had been in the construction business since the early 1970's and that Usonia was a licensed general contractor and that either George Ricker or Usonia held licenses including master plumber, heating and air conditioning installation, mechanical contractor, and electrician. Furthermore, the Trial Court found that it was "Usonia's attempt to add special features to the Plaintiffs' home at extra cost [to be borne by Usonia] (for Usonia to use as a demonstration home for other customers), and the inability to find other sources of funding [that] spelled failure for Usonia, and resulted in damages to the Plaintiffs." The evidence reveals that Plaintiffs had a construction loan sufficient, along with their initial $40,000 payment to Usonia, to cover the construction contract amount on the house as originally contracted for Usonia to build. The fact that Usonia did not have the financial resources to complete its agreement with Avalon Golf to take-down a certain number of lots within a certain time frame has no relevance as to whether Usonia had the financial ability at the time the contract between Plaintiffs and Usonia was executed, given Plaintiffs' construction loan of $220,000 and Plaintiffs' initial $40,000 payment, to construct Plaintiffs' home as originally contracted.

The later agreement made solely between Usonia and Plaintiffs to add extra numerous upgrades to Plaintiffs' house at no charge to Plaintiffs, Usonia's failure to find other sources of capital, and Usonia's mismanagement of funds all occurred after Avalon Golf's selection of Usonia as a builder. As such, these events are not relevant to the analysis of whether Avalon Golf negligently selected Usonia as the builder. Usonia had the skills and ability to do the job, as found by the Trial Court.

Further, Plaintiffs presented no relevant proof that Usonia did not have the financial resources, using Plaintiffs' original $40,000 payment to Usonia and Plaintiffs' construction loan, to commence and complete construction of Plaintiffs' house as originally contracted.

Therefore, the evidence presented by Plaintiffs at trial is insufficient to show any conduct by Avalon Golf falling below the applicable standard of care that amounts to a breach of any duty owed to Plaintiffs relating to Avalon Golf's selection of Usonia as the exclusive builder of The Legends. Given this, the Trial Court erred in holding Avalon Golf negligent in selecting Usonia as the builder, and we reverse the Trial Court's holding that Avalon Golf is liable to Plaintiffs for the negligent selection of Usonia as the builder.

Our resolution of the first two issues pretermits the necessity of considering the remaining issues raised on appeal. We reverse the Trial Court's judgment as to Avalon Golf and affirm the judgment as to all other defendants.

### Conclusion

The judgment of the Trial Court holding Avalon Golf liable for negligent misrepresentation and negligent selection is reversed. The judgment of the Trial Court is affirmed as to all other defendants, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellees, O. Hogan Harrison, and Sally D. Harrison.