NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0165n.06

Case No. 22-5758

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Apr 13, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| EAST HALLOWS LIMITED LIABILITY COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| LIVE NATION ENTERTAINMENT, INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before: COOK, GRIFFIN, and NALBANDIAN, Circuit Judges.

COOK, Circuit Judge. Rae Solomon envisioned an all-female music festival. She formed a company, East Hallows Limited Liability Company, made some calls, publicized the event, and applied for funding from Live Nation Entertainment, Inc. Live Nation showed initial interest but declined to support the project. East Hallows sued, asserting that Live Nation made negligent and intentional misrepresentations during their discussions. Premised on diversity jurisdiction, Live Nation removed the action from Tennessee state court to federal court. The district court granted Live Nation summary judgment, and East Hallows appeals. We AFFIRM.

I.

The music festival industry frustrated Rae Solomon. She thought the industry lacked spaces for female artists, but this realization inspired her to plan her own all-female country music festival. She would call it the Zenitheve Music Festival.

In late 2017, Solomon asked Jacob Green, her future husband, to partner with her. The two put together a business plan, contacted friends in the industry for advice, and hired a law firm to iron out their corporate form, trademarks, and logos. Green and another investor funded these initiatives.

Solomon and Green publicly announced Zenitheve in March 2018 after they received the articles of organization for their new company, East Hallows Limited Liability Company. The announcement piqued the interest of several industry players. Through this exposure, Solomon learned about Live Nation Entertainment, Inc.'s Women Nation Fund. The Fund invests "in female-founded live music businesses [to] provide access to capital for underrepresented female entrepreneurs in the Concert Promotions, Events and Festival space." R.54 ¶ 15.

Solomon applied for this funding. She acknowledged in her application that her all-female music festival was not the first of its kind. As she put it, Zenitheve embodied "the modern age, predominantly country spin, of the hit 90's tour Lilith Fair." R.43-10 at 2.

After first rejecting Solomon's application for funding in June, Live Nation reconsidered in July. Carrie Davis, Live Nation's Chief Communications Officer, emailed Solomon to set up a call with her and Michael Wichser, the Senior Vice President of Merger and Acquisitions. When the three spoke, Solomon described her efforts to date—she had reached out to female artists, touched base with iHeart Radio and the Country Music Association, and applied to hold the festival at the Jay Pritzker Pavilion in Chicago. Wichser told Solomon that "this is right down the fairway for the kind of stuff we're interested in," Live Nation would "certainly . . . have interest in participating to a large extent," he needed to "sort of figure out how to structure something that will work . . . and help [Solomon] get it above the ground," and this was "exactly what the fund is set up for." R.49-5 at 44–45.

Solomon followed up after the call, and Wichser requested "more detail" on Solomon's business plans and "specifics" for "next steps." R.50-4 at 2. He wanted to see a "summary business plan with financial estimates for what an investment/partnership with Live Nation would look like." *Id.* Wichser also wondered how Solomon planned to staff the festival and why she felt convinced that her proposed artists would draw enough attendance. Live Nation still needed "a more complete understanding of what [it] would be investing in." *Id.*

Solomon responded to Wichser's requests. The festival still faced key hurdles. Solomon told Live Nation that she hoped for a lineup that "look[ed] something like Kacey Musgraves, Maren Morris, Cam, Ashley McBryde, Carly Pearce, Lauren Alaina, [and] Lindsay Ell," but East Hallows had not yet booked any artists. R.50-6 at 2. And East Hallows's business plan sought a $4,000,000 investment from Live Nation, projected $14,250,000 in revenue, but also estimated a negative 46.95% return on investment in the first year.

Solomon, Davis, and Wichser spoke again in September. Wichser expressed enthusiasm and an interest in "keep[ing] the conversation going," and stated that he had "preview[ed]" the proposal with Live Nation's CEO "weeks ago." R.54 ¶ 28. Wichser again emphasized that the project was "right down the pipeline of what a fund like this would want to do," but that it would be "good to have something in writing to formally go and say here's a proposal we want to support, here's the structure we'd recommend, and here are the ligaments." R.49-5 at 46–47. He requested more information from Solomon "outlin[ing] some of the basic tenants of [the] timeline and the festival." *Id.* at 46. Then, he explained, "[w]e'll review that timeline, potential artists are X, Y, and Z and we can sort of circle around." *Id.*

In October, the discussions fell apart. Wichser, for his part, felt the business plan was lackluster, worried about Solomon's abilities to obtain artists or get a team in place, and thought

her projected revenues were too high. Davis thought that the proposal was not "compelling or unique" and that she had seen "no real progress," and that Solomon's "proposal [was] not accurate" because Solomon had not yet confirmed any sponsorships or artists. R.48-5 at 3. And Live Nation sought to invest in an "ongoing business," that could be "financially successful," not a single festival. *Id.* at 5. Live Nation told Solomon that the all-female lineup presented too much risk and suggested working together in future years.

A month later, Live Nation announced an all-female day at its Lake Shake Festival, featuring some of the artists that Solomon had envisioned for Zenitheve. Lake Shake was a few weeks after Zenitheve's projected date and mere miles from Zenitheve's projected site. Investors pulled out of Zenitheve, and Solomon halted the project.

East Hallows sued Live Nation, claiming intentional and negligent misrepresentation under Tennessee law, and seeking $25 million in compensatory damages. After discovery, East Hallows claimed that it lost $82,201.77 in original investment, over $1.5 million in artist fees, and $138,600 in merchandise profits.

Live Nation moved for summary judgment. Finding no actionable misrepresentations by Live Nation, the district court granted the motion. East Hallows appeals.

## II.

"We review a district court's grant of summary judgment de novo." *Ison v. Madison Loc. Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 892 (6th Cir. 2021). A court appropriately grants summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view[] the factual evidence and draw[] all reasonable inferences in favor of the non-moving party." *Thompson v.*

*Fresh Prods., LLC*, 985 F.3d 509, 518 (6th Cir. 2021) (quoting *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 502 (6th Cir. 2013)).

### III.

Under Tennessee law, a plaintiff asserting a claim for intentional or negligent misrepresentation must prove by a preponderance of the evidence: "(1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; . . . [(4)] that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and [(5)] that the plaintiff sustained damages as a result of the representation." *Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012); *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008). For intentional misrepresentation claims, the plaintiff must also show that the defendant acted with knowledge or recklessness as to the statement's falsity. *Hodge*, 382 S.W.3d at 343. For negligent misrepresentation claims, the plaintiff must prove that a "business or professional person[] . . . negligently suppl[ied] false information for the guidance of others in their business transactions." *Id.* at 345 (quoting *John Martin Co. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 433 (Tenn. 1991)).

On appeal, East Hallows challenges the district court's determinations that it failed to identify actionable misrepresentations or false information that could serve as the basis for its claims.

### A.

The district court concluded that East Hallows identified statements that consisted of only sales talk, future intention, and opinion or that it had not proven false. We agree. East Hallows has not shown that Live Nation made any misrepresentations in its dealings with Solomon.

A statement of opinion, puffery, or future intention generally cannot be a "false" statement. *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982). But if, for example, a defendant expresses its opinion as an existing fact, leaving no room for doubt, then that statement could be an actionable misrepresentation. *See Davis v. McGuigan*, 325 S.W.3d 149, 155 (Tenn. 2010) (discussing the difference between a statement expressing a belief that a plot of land consists of ten acres and an affirmative statement that a plot of land consists of ten acres (citing Restatement (Second) of Torts § 538A cmt. c (1977))). Or, if a defendant promises future action but "without the present intention to carry out the promise," that may form the basis of a misrepresentation claim sounding in promissory fraud. *Oak Ridge Precision Indus., Inc. v. First Tenn. Bank Nat'l Ass'n*, 835 S.W.2d 25, 29 (Tenn. Ct. App. 1992).

East Hallows claims on appeal that Wichser made seven misrepresentations on calls with Solomon in July and September 2018. As to the July call, East Hallows points to four of Wichser's statements: (1) "I think this is right down the fairway for the kind of stuff we're interested in"; (2) "[t]his sounds like it's pretty timely to me and I can tell you right now I mean we are certainly going to have interest in participating to a large extent"; (3) "I need to sort of figure out how to structure something that will work for you and help you get it above the ground"; and (4) "[t]his is exactly what the fund is set up for." Appellant Br. 7–8, 19, 21, 23. As to the September call, East Hallows points to three of Wichser's statements: (5) "[w]e were super excited by our first meeting as you heard probably in our enthusiasm and obviously want to keep the conversation going"; (6) "[w]e'll review the timeline, potential artists are x, y and z and we can sort of circle around, and then we can be comfortable investing in all this stuff and try to get that to you in short order"; and (7) "[c]learly what you're trying to accomplish is right down the pipeline of what a fund like this would want to do. I think there's no doubt about it." *Id.* at 23–24.

The district court correctly concluded that Wichser's first, third, and fifth statements consisted of opinions, sales talk, or future intention statements. By stating, "I think [Zenitheve] is right down the fairway" for Live Nation's interests, Wichser couched this statement in an opinion term, "I think." *See Harrison v. Avalon Props., LLC*, 246 S.W.3d 587, 601 (Tenn. Ct. App. 2007) (explaining that a real estate agent's statement that she had "found a much better builder" formed an opinion, not a representation). When Wichser expressed that he needed to figure out a structure and help Solomon "get [Zenitheve] above the ground," he included no promise to do anything for East Hallows. *See Fitzgerald v. Hickman Cnty. Gov't*, No. M2017–00565–COA–R3–CV, 2018 WL 1634111, at *18 (Tenn. Ct. App. Apr. 4, 2018) (statements that evinced an intent to hire the plaintiff were not an "unequivocal[] promise" to do so). And when Wichser stated his desire "to keep the conversation going," he did not make any promise to East Hallows of future action and cabined his speech in sales talk terms like "super excited" and "enthusiasm." *See Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 927, 931 (6th Cir. 2006) (deciding that a Bank's statements in a sales presentation that it would act as a financial advisor and recommend appropriate strategies for its clients consisted of generalized sales talk).

We also agree with the district court that East Hallows presented no evidence casting doubt on the truth of Wichser's fourth, sixth, and seventh statements concerning the Fund's focus on female initiatives like Zenitheve or Wichser's plans to circle back after he received more information. East Hallows, as the party claiming fraud, holds the initial burden to prove falsity. *Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009). But we cannot glean from the record that Wichser relayed incorrect information about the Fund's purposes or that he stated that he would "review the timeline" and "potential artists" and "circle around" without a present intention to do so.

The district court did not address the second statement—that Live Nation would "certainly . . . have interest in participating to a large extent"—but "[w]e may affirm the district court's dismissal of a plaintiff's claim on any preserved ground, including a ground not relied on by the district court," *In re Harchar*, 694 F.3d 639, 644 (6th Cir. 2012), and this statement fails for the same reasons as the others. An expression of *interest* in participating in a project is not a promise to do so. Thus, the statement represents nothing more than Live Nation's interest in the project. More still, East Hallows does not point to evidence that Live Nation lacked this initial interest.

East Hallows challenges this conclusion. It urges us to consider the statements together. True, context can transform the effect and meaning of words. *See La.–Pac. Corp. v. James Hardie Bldg. Prods., Inc.*, 928 F.3d 514, 520 (6th Cir. 2019). But considering Wichser's statement that he would need to help Zenitheve get "above the ground" against the backdrop that Live Nation had an "interest" in participating in the project does not amount to a promise that Live Nation would fund Zenitheve.

East Hallows protests that statements expressing Live Nation's interest in Zenitheve must have been false. It points to Live Nation's later explanation that it had no interest in a one-festival proposal as opposed to an "ongoing business." R.48-5 at 5. As East Hallows sees it, because Wichser knew all along that Zenitheve was a one-festival proposal, he must have lied from the beginning. But the reality that Live Nation concluded in October that it did not want to invest in a single-festival company lacking demonstrable financial viability does not create a factual dispute about its initial interest in the Zenitheve project. *See McElroy*, 632 S.W.2d at 131 (holding that a salesperson's statement that a builder knew how to construct a product was not false merely because the builder failed to do so later). This is especially so considering that East Hallows failed

8

to address Live Nation's many reasons explaining why its initial interest dissipated. Among those reasons: "it was not much more than a promotion opportunity with no real progress," "the artists that [Solomon] stated were confirmed were not in fact confirmed and the sponsorships were also not confirmed," and the proposal was not "advanced enough to warrant an investment by the Women Nation Fund." R.48-5 at 3. We can find no material dispute of fact on this point.

Last, East Hallows claims that Live Nation misrepresented any intention of working with East Hallows because it had only one motivation from the start: stringing Solomon along and stealing her idea. That speculation, however, crumbles against Live Nation's uncontradicted evidence that the organizer of the Lake Shake Festival, Brian O'Connell, had no knowledge of the Zenitheve proposal. East Hallows's expert report opining about the 1% chance that Live Nation could have independently arrived at its Lake Shake artist line-up does not create a dispute as to O'Connell's lack of knowledge.

And even if the record supported an inference that Live Nation copied Solomon's idea, that inference alone does not contradict the evidence showing that Live Nation had an initial interest in Zenitheve or the evidence showing why that interest waned. *See Hodge*, 382 S.W.3d at 343 (explaining that the representation must be false when made to establish a misrepresentation claim).

The district court correctly concluded that Live Nation made no actionable misrepresentations.

B.

Even if Wichser's statements relating to Live Nation's interest in working with East Hallows counted as actionable false statements, we would affirm the district court on other grounds

preserved below and supported by the record, *In re Harchar*, 694 F.3d at 644, because East Hallows could not have justifiably relied on any of Live Nation's statements.

When determining whether a person justifiably relied on a misrepresentation, Tennessee courts consider the totality of the circumstances. *City State Bank v. Dean Witter Reynolds, Inc.*, 948 S.W.2d 729, 737 (Tenn. Ct. App. 1996). Relevant considerations include "the plaintiff's sophistication and expertise in the subject matter of the representation"; "the type of relationship—fiduciary or otherwise—between the parties"; "which party initiated the transaction"; and whether the party who allegedly engaged in the fraud provided "relevant information about the representation," made a specific misrepresentation, concealed the misrepresentation, or "initiated the transaction." *Davis*, 325 S.W.3d at 158.

East Hallows claims that, by relying on Live Nation's representations, it lost $82,201.77 in original investment and over $1.5 million in fees and merchandise profits. But East Hallows did not justifiably rely on Live Nation's statements. Live Nation and East Hallows entered no formal agreement and Live Nation owed no special duties to East Hallows. Live Nation's statements maintained a non-specific and noncommittal nature. And Live Nation did not conceal its questions, doubts, or lack of commitment. Take the July call. Wichser sent Solomon follow-up questions about financial estimates, artists, and staffing to get a "more complete understanding of what [Live Nation] would be investing in." R.43-16 at 2. Wichser did not hide that his review of the Zenitheve proposal remained in preliminary stages, and Solomon acknowledged as much when she sent in more materials to "help[]" with the "due diligence." R.49-5 at 2. Now take the September call. Although Wichser said he had an interest in continuing the conversation with Solomon, Wichser also explained that he still needed to receive and review "outlines [of] some of the basic tenants of [the] timelines and the festival" to "help [Wichser] forward something along."

*Id.* at 46. In Solomon's own words, "obstacles" persisted. *Id.* Considering the totality of the circumstances, no reasonable juror could conclude that East Hallows justifiably relied on Live Nation's statements to make purchasing, planning, or investment decisions in the festival.

East Hallows responds that the sheer size and reputation of Live Nation justified its reliance on its statements. Not so. Despite Live Nation's music-industry prominence, its expressions of interest—without accompanying commitment—justify the grant of summary judgment in its favor.

IV.

We AFFIRM.